UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| JESSICA S. HOSEY, | ) | Civil Action No.: 3:15-cv-3282-JMC-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| ENTERPRISE LEASING COMPANY– | ) | |
| SOUTHEAST, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

In this employment discrimination case, Plaintiff alleges Defendants discriminated against her based on her race and sex and subjected her sexual harassment, all in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq.  Presently before the court is Defendant's Motion for Summary Judgment (Document # 30).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  This report and recommendation is entered for review by the district judge.

## II.    FACTS[1]

### A.    Plaintiff Hired by Enterprise's Charlotte Branch

On July 20, 2009, Enterprise's Charlotte Branch hired Plaintiff, an African-American female, to a management assistant position in its car rental division. Pl. Dep. 43:19–44:22 (Ex. A to Def. Motion). Plaintiff's duties and responsibilities in the Charlotte Branch's rental division included renting vehicles, customer service, selling insurance, and completing damage waivers. Pl. Dep. 46:20–25. Upon her hire, Enterprise trained Plaintiff on the company's sales practices, policies, and procedures. Pl. Dep. 54:3–55:25. The area sales manager was available on a weekly basis to train Plaintiff as needed. Pl. Dep. 56:12–57:3. Enterprise provided Plaintiff with its policies and procedures, including its Personnel Manual and sexual harassment policy. Policies Acknowledgment (Ex. B to Def. Motion); Sexual Harassment Policy (Ex. C. to Def. Motion). Plaintiff acknowledged that she was an at-will employee and that either she or Enterprise could "end the relationship at any time, with or without cause and with or without notice." Policies Acknowledgment; Pl. Dep. 58:16–24.

Enterprise conducts 30-day and 90-day reviews of its newly-hired management assistants. 30-day Review (Ex. D to Def. Motion); 90-day Review (Ex. E to Def. Motion). While Plaintiff's

---

[1]Plaintiff has provided very little with regard to the facts of this case. The statement of facts section in her response to Defendants' motion contains no citations to exhibits and is essentially a repeat of the allegations in her complaint. When responding to a motion for summary judgment, Plaintiff may not rely on her pleadings, but she must identify the facts in dispute with specific references to the location in the record. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Local Civil Rule 7.05 (A) (4), D.S.C. ("Where the memorandum opposes a motion for summary judgment, [it shall contain] a concise statement of the material facts in dispute with reference to the location in the record."). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." Brailsford v. Wateree Community Action, Inc., 135 F.Supp.3d 433, 448 (D.S.C. 2015) (citing Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir.1994)).

30-day review was generally positive, her 90-day review reflected lagging sales and other performance problems. Id. On January 11, 2010, Enterprise's management met with Plaintiff to address her deficient performance and sales. Email: Plaintiff's Sales (Ex. F to Def. Motion). Nevertheless, in her July 23, 2010 annual review, Enterprise noted 12 separate areas that "Requires Improvement." July 23, 2010 Review(Ex. G to Def. Motion). On August 3, 2010, Enterprise issued a written warning to Plaintiff for failure to meet her minimum sales expectations. Written Warning (Ex. H to Def. Motion). Enterprise warned Plaintiff that "this past month you did not meet these minimum expectations as your combined sales pkg was 58%. Next month [if] you fall under the 60% requirement again, you will be terminated." Id. Plaintiff received and signed the warning. Id. After the written warning, Plaintiff's performance did improve somewhat, although her August 2011 review still had three "Requires Improvement." July 20, 2011 Review(Ex. I to Def. Motion).

### B.    Plaintiff Transfers to Columbia Branch

In October 2011, Plaintiff requested a transfer to Enterprise's Columbia Branch. Pl. Dep. 100:6–10. The Columbia Branch accepted the transfer, and Plaintiff moved to Columbia to work in the same position that she held in Charlotte: a management assistant in the rental division. Pl. Dep. 100:18–25. Although the Columbia Branch had different sales goals for corporate accounts, a different call back and system for working corporate accounts, Plaintiff's duties and responsibilities were "pretty much" the same in Columbia as they were in Charlotte. Pl. Dep. 101:21–25; 103:16–24. Plaintiff continued to work in the Columbia Branch's rental division for approximately six months. Pl. Dep. 111:7–10.

### C.    Plaintiff Takes Account Executive Position

In April 2012, Plaintiff's supervisor in the rental division recommended to her that she apply for a position as an account executive with Enterprise. Id.; Pl. Dep. 129:16–18. An account executive

differed from a management assistant in that account executives were responsible for selling vehicles, while management assistants were responsible for renting vehicles. Pl. Dep. 128:17–25. Plaintiff interviewed for the account executive position with Jarrett Harrelson, the Columbia Branch's Group Car Sales Manager. Pl. Dep. 131:4–15. Mr. Harrelson offered and Plaintiff accepted a position as an account executive. Pl. Dep. 131:18–25.

In May 2012, shortly after she accepted the account executive position, Enterprise sent Plaintiff to corporate headquarters in St. Louis for training. Pl. Dep. 122:1–123:6. Enterprise's account executives nationwide all receive sales training at corporate headquarters. Pl. Dep. 124:14–16. Upon her return to Columbia, Enterprise provided additional training to Plaintiff, personally and through computer-based training modules. Pl. Dep. 127:2–19; Training Certificate (Ex. K to Def. Motion). Enterprise also informed Plaintiff about its sales expectations. Sales Expectations (Ex. L to Def. Motion). Account executives were required to: "**Maintain a 8 car delivery average per month for a 12 month [Account Executive] tenure; 5 car delivery average per month for an [Account Executive] with 6–11 months tenure.**" Id. (emphasis in original). Enterprise further advised Plaintiff of the consequences should she fail to meet the sales expectations:

> THE ABOVE REQUIREMENTS ARE A MINIMUM TO MAINTAIN YOUR CAREER PATH WITH ENTERPRISE CAR SALES. IT WILL TAKE A GREAT ATTITUDE AND DEDICATION TO MAINTAIN THE ABOVE. FAILURE TO MEET THESE REQUIREMENTS WILL SUBJECT YOU TO ACTION UP TO AND INCLUDING TERMINATION. YOU CAN USE THIS AS A DAILY TO DO LIST TO BE SUCCESSFUL.

Id. (emphasis in original). Plaintiff signed the document, acknowledging receipt and understanding of Enterprise's sales expectations, including that she would be subject to termination if she failed to meet the sales goals. Id.; Pl. Dep. 136:12–139:25. The Columbia Branch maintained a board with

a running tally of all car sales so each account executive always knew how many cars they sold, and how many they needed to sell, to meet the monthly sales expectation. Pl. Dep. 135:12–136:8.

### D.    Plaintiff's Performance

Within a few months after Plaintiff moved to the account executive position in the Columbia Branch's car sales division, Enterprise began to experience problems with her performance. Plaintiff's immediate supervisor was Maurice Campbell, an African-American male. Pl. Dep. 148:24–150:16. On July 16, 2012, Mr. Campbell issued a written warning to Plaintiff for failing to be on time to the July staff meeting: "The message was clear in the June staff meeting that we needed everyone on time and ready to go with all appropriate information. We do these meetings once a month and it is vital that you are present and on time." Written Warning (Ex. M to Def. Motion). Plaintiff acknowledged receipt of the written warning. Pl. Dep. 148:18–21.

On July 12, 2012, Enterprise issued a memorandum to all account executives advising them of the sales expectations for the Columbia Branch. Each account executive acknowledged:

> I understand that the Enterprise Car Sales Division expectation is to sell 10 cars every month.
>
> I understand that if my 3-month sales average falls below the corporate average, (currently at 8 deliveries or 24 total deliveries based on a 3 month roll), I will be placed on probation.
>
> Failure to maintain a 3-month rolling average of 8 deliveries or 24 deliveries will result in disciplinary action up to and including termination.
>
> Requires improvement- 7 or below
> Meets Requirement- 8–10
> Exceeds Requirement- 11–14
> Outstanding- 15 and above

Sales Performance Memorandum (Ex. N to Def. Motion). Plaintiff signed Enterprise's written sales expectations and initialed each paragraph separately. Id.

At the end of July 2012, Mr. Campbell conducted Plaintiff's performance review for her first three months as an account executive. July 2012 Review (Ex. O to Def. Motion); Pl. Dep. 154:9–21. Overall, Plaintiff received a "Meets Expectations" for this first review. Id. However, Mr. Campbell warned Plaintiff that she "Requires Improvement" because she averaged only 2.2 cars per month, five fewer than the expectation. Id.; Pl. Dep. 155:5–11. Mr. Campbell noted:

> Jessica, you are a Requires Improvement on this section. Your 2.2 Average over a 3 month period is unacceptable. With that being said, I know with the addition of accounts and with more training and coaching we can get you to the average of 7+ cars a month.

Id. Mr. Campbell also warned Plaintiff about her continued tardiness:

> You require improvement when it comes to punctuality. You are consistently 5–10 minutes late weekly and have been 20+ minutes late for the past two monthly meetings.

Id. Mr. Campbell also rated Plaintiff as "Requires Improvement" in 14 other areas, including attitude and initiative, business development, sales process, goal setting, time management, and communication. Id. Mr. Campbell outlined goals for Plaintiff to increase her sales from 2.2 vehicles per month to over 7 vehicles per month. Id.

In the comments section of her review, Plaintiff was enthusiastic and complimentary of the car sales division team: "The past 3 months as an AE has been AWESOME! [The Columbia Branch] has an amazing team and I am glad to be a part of it. I love the aspect of meeting new people and also learning new things." Id. Plaintiff wrote the account executive position was a "great fit" and the "sky is the limit!" Id.

Plaintiff again expressed her excitement and support for the car sales team in the Columbia Branch. In November 2012, Enterprise was interviewing internal candidates for an Assistant Manager position. Pl. Dep. 163:5–23. Enterprise asked Columbia Branch employees for feedback

on the candidates. Exhibit P ("Awesome Team!!" Email). Plaintiff responded that she believed each candidate was great and that she was "glad to be apart of such an awesome team!!" Id.

On November 12, 2012, Enterprise warned Plaintiff about leaving $200 in gift cards in plain view on her desk. Written Warning (Ex. Q to Def. Motion). As the warning notes, the gift cards are the same as cash and should stay locked in the safe or be kept secured at all times. Id. On a separate occasion, Enterprise warned Plaintiff about her unprofessional interaction with customers:

> Jessica, we have discussed numerous times over the past couple of months that when responding to "Internet" Leads or "CU" Leads for AEs who are not here, that you are to "Forward" the lead to all of [the Columbia Branch] and say "got it". Over 10 times since November 9, 2012, you have done what we have asked you not to do. Responding "got it" to a customer or a CU Employee is extremely unprofessional and can hurt our partnerships. Corporate emailed me on November 13, 2012 and stated the same. After that time, Jarett Harrelson and I have sent you 3 messages regarding this and it continues to happen. This must be corrected immediately.

Written Warning (Ex. R to Def. Motion). Enterprise also warned Plaintiff for leaving work at 1 p.m., without having notified her manager. Written Warning (Ex. S to Def. Motion).

In addition to the multiple warnings about her poor performance, Plaintiff continued to fail meeting her sales expectations. On December 22, 2012, Mr. McKay, the Columbia Branch's Area Car Sales Manager, warned Plaintiff:

> [The Columbia Branch] expects a minimum sales average for an AE of 8 deliveries per month. Over the last 3 months, your sales are as follows:
>
> September 2012 – 1
> October 2012 – 1
> November 2012 – 3
>
> In order to maintain your position with Enterprise Car Sales, you must reach the minimum expectation for your position.
>
> Jessica Hosey, you need to sell a total of 24 cars by the end of February 2013 to increase your 3 month average to an 8 car average. This is the minimum average to maintain an AE position with Enterprise Car Sales. Due to your current sales numbers, you are being placed on a 90 day performance review that is back dated to

> December 1, 2012. Jessica Hosey, at this point, if you do not increase your average to the minimum expectation further disciplinary action up to and including termination will happen.

Performance Write-Up (Ex. T to Def. Motion). Plaintiff signed the write-up on December 22, 2012. Id.

### E.     Plaintiff's Transfer Request Back to the Charlotte Branch

In December of 2012, Plaintiff requested a transfer back to the Charlotte Branch. Transfer Request (Ex. U to Def. Motion). In the request, Plaintiff stated that she owned a house in Charlotte and had not been able to secure renters for the house for six months. Id. She stated that it would be economically more feasible for her to move back to Charlotte rather than maintain houses in both Columbia and Charlotte. Id.

Enterprise's policy regarding branch-to-branch transfers requires approval from the management of the transferring branch: "Transfers and promotions from one group/region to another require the written approval of the general manager, regional vice president or corporate officer (or his or her designee) of the group from which the employee is transferring." Personnel Manual p. 17 (Ex. J to Def. Motion). The Columbia Branch approved Plaintiff's transfer request. Pl. Dep. 187:23–188:10. Plaintiff testified "I thought that everything was done properly [by the Columbia Branch]" regarding the transfer request. Pl. Dep. 192:10–12. However, an Enterprise employee seeking a transfer is also required to meet certain performance requirements and be approved by the receiving branch:

> To be eligible for [car sales department] transfers, the employee must:
> •     Meet all requirements of the position.
> •     Have been in their position for 90 days.
> •     Have earned at least a meets requirements evaluation on his or her most recent review.
> •     Have no significant disciplinary actions on file for the past 12 months.

> The final approval for a transfer to a department other than Rental, including the terms and conditions of employment, rests exclusively with the group to which the employee is transferring.

Exhibit J at 17–18. The Charlotte Branch denied Plaintiff's transfer request. Email Denying Transfer (Ex. V to Def. Motion).

### F.     Plaintiff Resigns

After the Charlotte Branch refused to accept her transfer, Plaintiff took medical leave due to depression and anxiety, which a psychologist noted could be related to her employment.  Medical Record (Ex. H to Pl. Resp.).  She remained on leave until March 22, 2013, when she resigned.  Resignation Letter (Ex. W to Def. Motion).  Tyson Bragg, Enterprise's Group Human Resources Manager for the Columbia Branch, emailed Plaintiff explaining to her that the company had taken steps to address all concerns in the car sales division, asking her to reconsider her resignation, and inviting her to meet with him to discuss finding a position with the Columbia Branch where she could be successful. Bragg Email to Plaintiff (Ex. X to Def. Motion). Mr. Bragg wrote:

> I want to let you know that I would like for you to reconsider and I would appreciate the opportunity to meet with you. We value you as an employee and do not want to see you resign. It is regretful that you feel your words were disregarded. In review [Enterprise management] took your statements seriously during our internal investigation, and while I cannot go into specifics, I want to assure you that we have taken the appropriate action to address all concerns you raised during that investigation. I understand that you do not feel that returning to the Columbia Car Sales location is a viable option. I want to offer you the option to move back into our Daily Car Rental operations where you previously had success. However, I still believe that we can move forward with you in your current role, but that will take a commitment from you.

Id. Plaintiff's rejected Mr. Bragg's offer to return to Enterprise in any capacity, or to even meet with him to discuss alternatives.  Plaintiff Email to Bragg (Ex. Y to Def. Motion).

### G.     Plaintiff's Complaints of Discrimination

As discussed in footnote one above, Plaintiff's presentation of facts in this case is minimal

at best.  Her statement of facts section contains no citations to the record, and the exhibits attached to Plaintiff's response are sparse.  The "facts" presented by Plaintiff appear to have very little, if any, support in the record.  Although Rule 56 does not impose upon this court the duty to comb the record for evidence to support a party's claims, see Brailsford, 135 F.Supp.3d at 448, nevertheless, the undersigned reviewed the record to establish an understanding of the basis for Plaintiff's allegations. In the portions of Plaintiff's deposition that are in the record, Plaintiff testified that she felt she was not given the same opportunity as the white males that worked in car sales.  Pl. Dep. 261:1-3.  She also testified that "they'd" make jokes about how she should try to make a sale, such as "wear a short skirt," "show a little leg," and "show a little cleavage."  Pl. Dep. 261:16-18; 262:13-14.  Plaintiff also testified that "they" would also make comments about customers, "about their body or their breasts or she's hot, things like that, if a customer would come in that was attractive or something like that." Pl. Dep. 265:22-25.

Plaintiff alleges that she made complaints of discrimination in October and December of 2012, although the specific details of these complaints, including when they were made, to whom they were made, and the contents of the complaints, are not in the record.  In her resignation letter, she states that "the hostile work environment and constant harassment have left me depressed, terrified, and mentally drained."  Resignation Letter.  She states that she spoke to "HR and others about the matter on multiple occasions, but my words and the words of others were disregarded." Id.  Defendant has no record of any complaints of discrimination or harassment made by Plaintiff. Bragg Decl. ¶ 13 (Ex. BB to Def. Motion).

In addition, Plaintiff attaches to her response Exhibit E, albeit without any context or explanation.  The exhibit, which includes three typewritten pages, appears to be a report of an investigation.  The top of the exhibit states

Christian Arellano 01-07-13

Bryan Wilkerson, Dayna Cousins and Christian Arellano met January 7th as part of our investigation regarding a complaint filed concerning management at 26R2.

Pl. Ex. E.  The exhibit appears to have been drafted by Dayna Cousins ("[H]e did email me (Dayna Cousins) . . ."). Id.  The exhibit includes the statements "Christian has heard comments that were sexually or racially biases [sic] in Car Sales," "Christian had heard minority jokes with slave/master comments," "There was a discussion of [Plaintiff's] performance to which [Plaintiff] stated that she had not received any training," "Christian does not feel as though [Plaintiff] was set up to be successful because of lack of training and bad accounts." Id.

On December 24, 2012, two days after Plaintiff went out on leave, Defendant received an anonymous complaint through its Ethics Point call center about inappropriate conduct by Mr. McKay in the car sales division. Bragg Decl. ¶ 14. Defendant investigated the anonymous complaint and interviewed multiple witnesses and Mr. Harrelson, the Columbia Branch's Group Car Sales Manager, determined that Mr. McKay should be disciplined with a written warning. Bragg Decl. ¶¶ 15–16.  On January 16, 2013, Mr. Harrelson met with Mr. McKay and issued him a written warning. Bragg Decl. ¶ 17.

## III.    STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine

-11-

dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Discrimination

Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to

hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1).

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, she may establish through direct or circumstantial proof that a protected characteristic such as race or sex was a motivating factor in the employer's adverse decision. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir.2004) (en banc). When direct evidence is lacking, a plaintiff may proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination. Id. To establish a prima facie case of either race or sex discrimination, the plaintiff must present facts showing that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) similarly-situated employees outside the protected class received more favorable treatment. White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir.2004). The fourth element can also be met by showing other circumstances giving rise to a reasonable inference of unlawful discrimination. Miles v. Dell, Inc., 429 F.3d 480, 486–87 (4th Cir.2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her.

In her complaint, Plaintiff alleges race discrimination "in failing to continue to employ Plaintiff due to her race, color, or national origin; in showing preferential treatment to Caucasian employees and detrimental treatment to Plaintiff; and in constructively discharging Plaintiff due to her race, color or national origin and in retaliation for reporting the discrimination and inappropriate behaviors." Compl. ¶ 66. She alleges discrimination based on sex "in failing to continue to employ Plaintiff due to her sex and gender (female); and in constructively discharging Plaintiff due to her sex and gender (female) and in retaliation for Plaintiff filing reports of the discrimination and inappropriate behaviors." Compl. ¶ 53.[2]

Defendant argues that Plaintiff cannot establish a prima facie case of discrimination based on either race or sex because she fails to show satisfactory job performance, an adverse employment

---

[2]Plaintiff has not asserted a separate claim for retaliation.  Pl. Dep. 270.

action or that similarly situated employees outside her protected class were treated more favorably. As set forth in detail above, Plaintiff consistently fell below her sales goals and received several written warnings during her short tenure as an account executive. She does not dispute this in her response, but points to other evidence of success, such as her score of 92.9 on a management qualification interview she gave on August 31, 2011. Management Qualification Interview (Ex. A to Pl. Resp.). However, this score does not speak to her performance in the account executive position she began in April or May of 2012. See White, 375 F.3d at 295 (holding that the employee must show satisfactory job performance at the time of the adverse employment action). Plaintiff also points to the fact that, overall, she received a "Meets Expectations" score on her July 2012, performance review. She also points to an email stating that her company car had been chosen for a random audit and "all in all it was good!" Company Car Audit Email (Ex. C to Pl. Resp.). However, Plaintiff does not dispute that sales goals were especially important, and that failure to meet the minimum sales requirements would subject her "to action up to and including termination." See Sales Expectations Memo.[3]

Defendant also argues that Plaintiff fails to show that she suffered any adverse employment action. "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." James v. Booz–Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004). "A tangible employment action constitutes a significant change in

---

[3]There does appear to be a potentially admissible hearsay statement in the record of one of Plaintiff's coworkers who felt Plaintiff may not have been sufficiently trained and given bad accounts. The statement is without specifics and fails to create a genuine dispute of material facts as to whether Plaintiff was performing at a level that met her employer's reasonable expectations. Nevertheless, even if Plaintiff could meet this prong of the prima facie case, she fails to present sufficient evidence, as discussed below, to show that she suffered an adverse employment action or that similarly situated employees were treated more favorably.

-15-

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Here, Plaintiff resigned after being on medical leave for approximately three months. Tyson Bragg, Enterprise's Group Human Resources Manager for the Columbia Branch, asked Plaintiff to reconsider her resignation and invited her to meet with him to discuss a position with the company where she could be successful, which Plaintiff declined. Thus, no tangible employment action was taken against her.

Plaintiff does, however, allege that she was constructively discharged. The "constructive discharge concept is the legal fiction by which wrongful termination claims are salvaged where no actual termination or other adverse employment action has, in fact, occurred." Alford v. Wang, Inc., 11 F.Supp.3d 584, 594 n.1 (D.S.C. 2014). Constructive discharge occurs in the employment discrimination context when an employer deliberately makes the working conditions of the employee so intolerable in an effort to induce the employee to quit or force the employee into involuntary resignation. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353–54 (4th Cir. 1995) (citing Bristow v. The Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985). Because claiming constructive discharge is "susceptible to abuse by those who voluntarily leave their employment," it must be "strictly cabined." Alba v. Merrill Lynch & Co., 198 F. App'x 288, 294 (4th Cir. 2006). To prove constructive discharge, the working conditions must be "so intolerable that a reasonable person would have felt compelled to resign." Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). The evidence produced by Plaintiff is insufficient to create an issue of fact here. Plaintiff fails to present evidence that her working conditions were so intolerable that a reasonable person would have felt compelled to resign. Although she testified that other people working there made comments about her appearance and the appearance of female customers, this is not sufficient to create an intolerable

work environment. See, e.g., Singleton v. Dep't of Corr. Educ., 115 Fed.Appx. 119, 120, 122 (4th Cir.2004) (unpublished) (finding that the plaintiff had not satisfied the objectively severe or pervasive conduct requirement, despite evidence that, inter alia, an employee insistently complimented [the plaintiff]; stared at her breasts when he spoke to her; on one occasion, he measured the length of her skirt to judge its compliance with the prison's dress code and told her that it looked 'real good'; [and] constantly told her how attractive he found her"); Freire v. Keystone Title Settlement Servs., Inc., No. AW-08-2976, 2009 WL 5217033, at *5 (D. Md. Dec. 30, 2009), aff'd, 389 Fed.Appx. 306 (4th Cir. 2010) (compliments about plaintiff's breasts while hugging her and comments like "you look hot and sexy" were not sufficiently severe and pervasive); Tawwaab v. Virginia Linen Service, Inc., 729 F.Supp.2d 757, 783 (D.Md. 2010) (noting that "the 'severe and pervasive' standard required to state a hostile work environment claim is lower than the 'intolerability' standard required for a constructive discharge claim") (citing Tutman v. WBBM–TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir.2000) ("[W]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment.").

Finally, Defendant argues that Plaintiff fails to show that similarly situated employees outside her protected class were treated differently.  To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it .'" Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006).  Plaintiff argues that she was not given the leads for sales or the training needed to complete the requested items she needed to improve while Caucasian males were flourishing within the company, and she points to the statement made by a coworker, Christian Arellano, that he felt she had not received the

-17-

training and support she needed.  However, conclusory statements, without more, are insufficient to create an issue of fact.  <u>Barber</u>, 977 F.2d at 874-75.

In sum, Plaintiff has failed to present sufficient evidence to show that she was meeting Defendant's legitimate job expectations, that she suffered an adverse employment action, or that similarly situated employees outside her protected class received more favorable treatment.  As such, she has failed to establish a prima facie case of either race or sex discrimination, and summary judgment is appropriate.

**B.     Sexual Harassment**

Plaintiff also alleges a cause of action for sexual harassment.  She alleges that Mr. McKay subjected her to "visual and verbal contact by sexual advances and gestures that were initiated, maintained, and repeated" even after she informed him that the contact was unwanted. Compl. ¶ 41.  She further alleges that Defendant allowed such contact and refused to remove Plaintiff from the hostile work environment and sexual harassment.  <u>Id.</u>  In her response, Plaintiff characterizes her claim more as a hostile work environment claim.   A hostile work environment occurs when discriminatory conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."  <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65 (1986) (citing 29 C.F.R. § 1604.11(a)(3)).  To establish a prima facie case of hostile work environment/sexual harassment, Plaintiff must show the alleged conduct was (1) unwelcome, (2) based on her gender, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) imputable to Defendant.  <u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003).

As stated above, Plaintiff testified during her deposition that her coworkers would make jokes about how she should try to make a sale, such as "wear a short skirt," "show a little leg," and

-18-

"show a little cleavage." Pl. Dep. 261:16-18; 262:13-14. Plaintiff also testified that "they" would

also make comments about customers, "about their body or their breasts or she's hot, things like that,

if a customer would come in that was attractive or something like that." Pl. Dep. 265:22-25. She

testified that her sexual harassment claim was based upon these same comments:

> Q. Now, your complaint also alleges a claim for sexual harassment . . . is that claim
> different from your gender discrimination claim?
>
> A. No, it's just the comments.
>
> Q. Same thing?
>
> A. The things they were saying?
>
> Q. Okay. Did anybody at Enterprise ever touch you in an inappropriate way?
>
> A. No. It was all verbal.
>
> Q. Did anybody ever proposition you in any way while you were employed at
> Enterprise?
>
> A. No.
>
> Q. Did anybody ever request anything from you in return for any type of
> advancement at work? And by that I mean, any sort of sexual favors?
>
> A. No, not that I can remember.

Pl. Dep. 268:17–269:7.

Defendants argue that Plaintiff has failed to show that the comments about which she

complains were sufficiently severe or pervasive to alter the terms and conditions of her employment.

"Element three of a hostile work environment claim [sufficiently severe or pervasive] requires a

showing that 'the environment would reasonably be perceived, and is perceived, as hostile or

abusive.'" Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (citing Harris

v. Forklift Systems. Inc., 510 U.S. 17, 22 (1993)). The Fourth Circuit has established a four factor

-19-

approach to evaluate the totality of the circumstances in determining whether conduct is severe or pervasive: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Connor v. Schrader Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir.2000).  The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test."   Sunbelt Rentals, Inc., 521 F.3d at 315. Here, for the same reasons discussed above with respect to Plaintiff's constructive discharge argument, Plaintiff fails to show that her environment was severe or pervasive.  See, e.g., Singleton, 115 Fed.Appx. at 120-22 (finding that the plaintiff had not satisfied the objectively severe or pervasive conduct requirement, despite evidence that, inter alia, an employee insistently complimented [the plaintiff]; stared at her breasts when he spoke to her; on one occasion, he measured the length of her skirt to judge its compliance with the prison's dress code and told her that it looked 'real good'; [and] constantly told her how attractive he found her"); Freire, 2009 WL 5217033, at *5 (compliments about plaintiff's breasts while hugging her and comments like "you look hot and sexy" were not sufficiently severe and pervasive). "[W]hile no one condones boorishness, there is a line between what can justifiably be called sexual harassment and what is merely crude behavior." Ziskie v. Mineta, 547 F.3d 220, 228 (4th Cir.2008).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" that would support a hostile work environment claim.  Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The comments about which Plaintiff complains, while crude, do not amount to sexual harassment actionable under Title VII. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that Title VII does not establish a

"general civility code for the American workplace"). Accordingly, summary judgment is appropriate on this claim as well.[4]

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 30) be granted and this case be dismissed in its entirety.


                                     s/Thomas E. Rogers, III
                                     Thomas E. Rogers, III
                                     United States Magistrate Judge

January 17, 2017
Florence, South Carolina

---

[4]Even if Plaintiff had presented sufficient evidence of a sexually hostile work environment, Defendant is entitled to the Faragher-Ellerth affirmative defense, which provides a defense to liability for harassment by a supervisor if the employer can show "(1) [it] exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Vance v. Ball State Univ., __ U.S. __, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013) (citing Faragher v. Boca Raton, 524 U.S. 775, 807 (1998)); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). It is undisputed that Defendant had a sexual harassment policy in place, that it had no record of any complaint by Plaintiff during her employment, that, upon receiving an anonymous complaint about McKay's behavior, it investigated the complaint and issued him a written warning, and that it received no more complaints regarding McKay's behavior after issuing him that warning. Bragg Decl. (Ex. BB to Def. Motion) ¶¶ 4-17. The anonymous complaint was received on December 24, 2012, two days after Plaintiff went out on leave, through its Ethics Point call center Bragg Decl. ¶ 14. Defendant asserts that it learned that it was Plaintiff who made the anonymous call only during her deposition in this case. Def. Reply n. 4. Accordingly, even if McKay did subject Plaintiff to a sexually hostile work environment, liability is not imputable to Defendant.